IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  4:08 CR 244 RWS |
| | ) | |
| RUSSELL GENDRON, | ) | |
| | ) | |
| Defendant. | | |

**MOTION TO DECLARE 18 U.S.C. §1466A UNCONSTITUTIONAL AS APPLIED TO
FICTIONAL WORKS OR, IN THE ALTERNATIVE, TO DISMISS THE INDICTMENT
FOR FAILURE TO ALLEGE A CRIME**

**A. Factual Background**

The Indictment returned in this case contains two counts, Count II alleges a violation of

Title 18 U.S.C. §1466A(a)(1). The charges stem from Defendant Gendron's alleged receipt of virtual

images of virtual minors engaging in sexually explicit conduct.  The Government alleges that six of

the images selected from his computer are obscene, in violation of federal law, and the standards set

forth in *Miller v. California*, 413 U.S. 15 (1973) (hereinafter the '*Miller* Test').

None of the images are alleged to contain any images, videos, or any other pictorial or audio

content of actual children. The charged works are not alleged to portray real people or events. Thus,

these images fall into the realm of pure 'fantasy.' Therefore, this case represents an attempt by the

United States of America to criminalize the virtual images of imaginary children– something that

has never been expressly affirmed by the United States Supreme Court, and something that strikes

at the very heart of the right to Freedom of Speech guaranteed by the First Amendment to the United

States Constitution. Mr. Gendron contends that this case constitutes an unconstitutional application

1

of § 1466A to virtual images of non-existent children.

**B. Introduction to Legal Argument**

Since the Supreme Court's 1973 decision in *Miller*, and its companion case, *Kaplan v. California*, 413 U.S. 115 (1973), the Government has repeatedly challenged the legality of various forms of expression. These cases, generally taking the form of criminal obscenity prosecutions, have tested the application of constitutional protections under the First Amendment. Federal and state prosecutions have challenged expression in a wide array of different forms, ranging from photography exhibits (*see, e.g., Cincinnati v. Contemporary Arts Center*, 57 Ohio Misc. 2d 9 (1990)), to song lyrics (*see, e.g., Luke Records, Inc. v. Navarro*, 960 F.2d 134 (11th Cir. 1992)), to live adult entertainment performances. *See, e.g., Southeast Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) (pertaining to the rock musical, "Hair").

**C. Pretrial Consideration Of Obscenity Issues**

This Court is empowered to make pre-trial, threshold obscenity determinations under *Fed.R.Crim.P.* 12, as well as applicable case law. *See United States v. Head*, 317 F.Supp. 1138, 1140 n.3 (W.D. La. 1970); *United States v. Gulf Oil Corp.*, 408 F.Supp.450 (W.D. Pa. 1975). In *Head*, the district court confronted the prosecution of an underground newspaper under federal obscenity laws. As in the case at bar, the defendants moved to dismiss the indictment, pursuant to Rule 12. The district court granted the motion following a legal/constitutional examination of the obscenity of the underlying materials.

The district court made the following significant findings:

1. The constitutionality of a statute upon which an indictment is based and [an] allegation that the indictment fails to charge an offense under the laws are issues properly heard on a motion to dismiss;

2

2. If it is clear on the face of the indictment charging the violation of obscenity statutes that the material was constitutionally protected, the indictment would only charge defendants with doing a legal act and it would add nothing to the charge to cite the statute; and

3. The trial judge has a duty to protect the constitutional rights of defendants who assert protection of the First Amendment. This requires the trial judge, when the issue is properly presented, to pass on the constitutional adequacy of the evidence before it can be submitted to the jury on the question of whether the statute was violated. The trial judge's decision is thus not a factual one, but a constitutional one.

*Id.* at 1140-41.

Also, significantly, the trial court equated the role of the trial judge in an obscenity case with that of a libel case involving actual malice. *Id.*, citing *New York Times v. Sullivan*, 376 U.S. 254 (1964), and the Fifth Circuit's decision in *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858 (1970). The court in *Head* affirmed "the importance of the trial judge's obligation to resolve the constitutional issue at the earliest possible point in the proceedings, where the First Amendment is involved." *Id.* at 1140 n.3. Citing specifically to the *Bon Air* decision, 426 F.2d at 865, (with a corollary cite to *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966)), the court ruled that "[i]n the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate." *Head,* 317 F.Supp. at 1140.

Constitutionally, "libelous and obscene statements share the same lack of protection, and statements alleged to be either libelous or obscene are entitled to the same stringent examination before found to go beyond the First Amendment." *Id.* The ruling in *Head* was later embraced by the Western District of Pennsylvania in *United States v. Gulf Oil Corp.*, *supra,* in which the district court cited to *Head* with reference to the power of the trial court to generate rulings on Rule 12 motions to dismiss. *Gulf Oil*, 408 F.Supp at 459.

Indeed, a pretrial determination is even more necessary in this case – implicating fundamental

3

rights under the First Amendment – than in the context of other nonconstitutional matters. A fundamental precept of the First Amendment to the United States Constitution is that all expression, whether written, pictorial, or by way of performance, is presumptively protected against government interference and restraint. *Doran v. Salem Inn, Inc.,* 422 U.S. 922 (1975); *Roaden v. Kentucky,* 413 U.S. 496 (1973); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981). Moreover, the loss of First Amendment rights, even for minimal periods of time, is presumed by the courts to constitute irreparable injury, *per se*. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976).

A citizen, such as Mr. Gendron, should not be subject to the jeopardy inherent in a trial based upon the challenged images, since, taken as a whole, they are patently nonobscene, and encompass serious literary, scientific and artistic value – as a matter of law.

By way of analogy, assume that the Government's prosecutorial efforts were directed against a potentially classic or otherwise important piece of literature, such as was the case in 1961 with Henry Miller's *Tropic of Cancer*.  *See Grove Press, Inc. v. Gerstein*, 378 U.S. 577 (1964) (*per curiam* opinion reversing state court obscenity findings). *Tropic of Cancer* is a robust work, renowned for its blunt, graphic depiction of sex.  While Mr. Gendron does not maintain that these images are equivalent to a modern day *Tropic of Cancer*, it was important to him to view these expressions of ideas generated by others. The threat of prosecution, coupled with the specter of a daunting federal court trial, is a strong deterrent to exercising one's freedom of speech.

Twenty-five years following the Supreme Court's consideration in *Grove Press*, the Court reaffirmed the principle that "rigorous procedural safeguards must be employed before expressive materials can be seized as 'obscene.'" *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 62 (1989) (citing *Marcus v. Search Warrant*, 367 U.S. 717 (1961), and *A Quantity of Copies of Books v.*

*Kansas*, 378 U.S. 205 (1964)). In these cases, the Court invalidated the pre-trial seizure of a large quantity of expressive materials absent a procedure "'designed to focus searchingly on the question of obscenity.'" *Fort Wayne Books*, 489 U.S. at 62 (quoting *A Quantity of Copies of Books*, 378 U.S. at 210).

Whereas the seizure of a single copy of a book or film for evidentiary purposes may be upheld based upon a mere finding of probable cause, the entire removal from publication requires an adversarial determination of the publication's obscenity. *Id.* (citing *Heller v. New York*, 413 U.S. 483, 492-93). Strict standards of proof must be maintained, and elevated consideration of such seizures is warranted "when materials [are] presumptively protected by the First Amendment." *Id.* at 63 citing *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326 n.5; *Roaden,* 413 U.S. at 502 (courts must "focus searchingly" on the issue of obscenity, *vel non*); *Schad*, 452 U.S. at 68 (when state action affects First Amendment rights, "the standard of review is determined by the nature of the right assertedly threatened or violated rather than the power being exercised or the specific limitations being imposed") (citations omitted). "The risk of prior restraint, which is the underlying basis for the special Fourth Amendment protections accorded searches for and seizure of First Amendment materials" motivates such a rule. *Maryland v. Macon*, 472 U.S. 463, 470 (1985). Similarly, where a licensing scheme threatens to impose a censorial prior restraint on speech, prompt judicial review of any determination of the licensing officials is mandated by the unique protections afforded to First Amendment protected communications. *FW/PBS v. City of Dallas*, 493 U.S. 215, 227-28 (1990).

Accordingly, where First Amendment rights of freedom of expression are affected by governmental action, the obligation and mandate to the court is to expeditiously review the validity

and constitutionality of such action under basic principles of First Amendment law. The First Amendment's paramount position among all constitutional rights requires that all action seeking to regulate First Amendment activity must be reviewed under the strictest form of scrutiny. *Gitlow v. New York*, 268 U.S. 652 (1925). All expression is presumed to be constitutionally protected. *Reno v. American Civil Liberties Union*, 521 U.S. 844, 874-75, 885 (1997). Consequently, cases impacting First Amendment rights must be viewed under a special light.

In the framework of the case at bar, the Government has chosen to submit for analysis to the jury a handful of images it has 'cherry picked' from a much larger collection of images.  The images chosen are but two random scenes each from three larger storylines which the government has not presented for consideration.  The entirety of the stories must be submitted before a probable cause determination can be made.  The partial presentation to the grand jury of selected frames is clearly unacceptable under the First Amendment. Of even greater note was the Government's wholesale seizure of the entire computer of Mr. Gendron thereby  imposing a de facto prior restraint on any continued receipt of speech by Mr. Gendron.

Thus, the Government failed to meet its obligation of presenting the full sequence of images as available at the time they were allegedly accessed by Mr. Gendron and in fact, may never be able to present the stories as a "whole" as they appeared when allegedly "received". Further, the government failed to permit the grand jury to make a fully informed determination of the nature of the materials in the context of the websites from which they were allegedly obtained, i.e., when taken 'as a whole.'  For these reasons, the Indictment must be dismissed because of the government's failure to present the evidence in accordance with the *Miller* test by only presenting isolated scenes and not the works in their entirety.

Should the court not dismiss on these grounds, the defense requests a pretrial adversarial determination of obscenity for the six charged images. Now, more than ever, the Government, prior to forcing Mr. Gendron to confront the jeopardy and burden of proceeding to trial, must be required to sustain its constitutional burden – in a pretrial, adversarial setting.  The court must (as a guardian of constitutional rights of the accused) make certain threshold determinations as to the scope and applicability of the challenged statute to fictional works such as those charged in the instant case. A review of the charged works would lead to a finding that the works are not obscene as a matter of law.

Accordingly, a thorough review of the law reveals that the Government is unable to proceed to trial because they do not possess and cannot recreate the "whole" of the works but only isolated scenes allegedly retrieved by Mr. Gendron from internet webpages which may or may not still exist.

**Entirely Fictional Works Should Be Treated Differently.**

*a. Historical Bases of United States Obscenity Law*

In order to fully understand the path of United States obscenity law, one must first reflect back to its history. The historical basis of United States obscenity law extends back to our Nation's English heritage. Fredrick Schauer, *The Law of Obscenity* 4 (1976).  But, as also observed, the obscenity doctrine has no precedent in early common law.  Theodore Schroeder,*"Obscene" Literature and Constitutional Law* 13-14 (1972).

*i. English Common Law Antecedents*

In the 16th Century, ecclesiastical and royal censorship of expression in England was more concerned with political and religious themes than with the sexually obscene.  The earliest licensing systems were primarily addressed to the vices of sedition and heresy. During the 17th Century, the

influence of Puritanism resulted in a sober intolerance of bawdy literature; the portrayal of sexual pleasure was strictly condemned.  Laurence H. Tribe, *American Constitutional Law* § 12-16 (2d ed. 1988).

The 17th Century case of *King v. Sedley*, 1 Keble 620 (K.B. 1663), marked the first time a court convicted anyone for sexually-oriented conduct alone. The defendant, a drunken Sir Charles Sedley, removed his clothing, delivered a profanity-laced speech from a London tavern balcony, and then proceeded to pour urine-filled bottles onto the underlying crowd, thus causing a riot. Sir Charles was cited for breach of peace, was fined and jailed for one week. Schauer, *supra*, at 4. This may well be attributed to Sedley's acts and not just his speech.

The beginning of the 18th Century witnessed the emergence of the common law crime of obscene libel; from then on, corruption of morals was an independent common law crime. *Id.* at 6. The first significant example of obscene libel appears in *Rex v. Curl*, 2 Str. 788, 93 Eng. Rep. 849 (1727), a case which involved the trial and conviction of the publisher Edmund Curl for his book, *Venus in the Cloister*, *or The Nun in Her Smock*. Schauer, *supra*, at 5-6. The book was a rather intemperate dialogue about lesbian love in a convent, combining both sexual and religious implications. While the religious aspect may be insignificant, politics motivated Curl's conviction. *Id.* The King's Bench's rationale in *Curl* laid the foundation for modern-day obscenity law:

> [Writing an obscene book] is an offence at common law, as it tends to corrupt the morals of the King's subject, and is against the peace of the King. Peace includes good order and government, and that peace may be broken in many instances without an actual force. 1. If it be an act against the constitution or civil Government; 2. If it be against religion; and, 3. If against morality. As to morality, [d]estroying that is destroying the peace of the Government, for government is no more than publick order, which is morality. *Curl*, 2 Str. at 789-90, 93 Eng. Rep. at 850.

The first known United States obscenity prosecution, *Commonwealth v. Sharpless*, adopted

8

*Curl's* reasoning when it noted, "an offence may be punishable, if in its nature and by its example, it tends to the corruption of morals. . . . . " 2 Serg. & Rawle 91, 102 (Pa. 1815). *Curl's* equation between public morality and public order also appears in one of the most significant modern cases affecting United States obscenity law, *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1941) (establishing the concept of the "fighting words" exception to First Amendment protections).

### ii. Early American Common Law

The American colonies, at least in their early stages, never attempted to proscribe speech for its sexual content alone. Schroeder, *supra*, at 40-41. Censorship in the colonies reflected the early common law focus on blasphemy and sedition. Felice F. Lewis, *Literature, Obscenity & Law* 1 (1978). United States obscenity prohibition first appeared in legislation protecting church rituals. *Id.* at 3. The earliest recorded United States obscenity cases purported to rely on English common law, but in fact, were the first cases published anywhere based entirely on the sexual content of expression. *See, e.g., Commonwealth v. Holmes*, 17 Mass. 336 (1821).

*Holmes* involved the obscenity prosecution of a book's author. In the case, the appellate judge directed his attention to the disputed points of law on which the defendant based his appeal, rather than the issue of whether the work was, in fact, obscene. *Id.* The judge tacitly assumed the nature of obscenity needed no explanation – that obscenity was readily recognizable beyond doubt or question. *Id.* The judge also appears not to have questioned, despite a complete absence of either statutory or common law authority, the ability of the state to ban material considered obscene. *See* Schauer, *supra*, at 10 (noting the court's assumption that obscene libel was common-law misdemeanor). *Holmes* was the first example of a United States court finding a non-pictorial, fictional work obscene.

9

Following *Holmes*, United States obscenity prosecutions were rare, despite the proliferation of obscenity and lewdness statutes. Schauer, *supra*, at 10-12. In fact, the first formal obscenity test in United States law did not originate in American courts, but in England in *The Queen v. Hicklin*, 3 L.R.-Q.B. 360 (1868). In *Hicklin*, the court pronounced the test to determine obscenity as "whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall." *Id.* at 371.

Under *Hicklin*, a court could find a book obscene on the basis of certain passages without considering the entire work and could look at the effect of those passages on particularly susceptible individuals rather than on the public as a whole. Schauer, *supra*, at 7-8. In *United States v. Bennett*, 24 F.Cas. 1093 (C.C.S.D.N.Y. 1879), an American court first adopted the *Hicklin* rationale. Thereafter, "prosecutions under the *Hicklin* rule took a heavy toll on contemporary literature." Tribe, *supra*, at § 12-16.

However, the *Hicklin* test and obscenity law in general were not without their detractors in the beginning of the 1900s. A notable detractor was the esteemed Judge Learned Hand who, in *United States v. Kennerley*, 209 F. 119, 120-21 (S.D.N.Y. 1913), eloquently stated his reservations as follows:

> I question whether in the end men will regard that as obscene which is honestly relevant to the adequate expression of innocent ideas, and whether they will not believe that truth and beauty are too precious to society at large to be mutilated in the interests of those most likely to pervert them to base uses. Indeed, it hardly seems likely that we are even to-day so lukewarm in our interest in letters or serious discussion as to be content to reduce our treatment of sex to the standard of a child's library in the supposed interest of a salacious few, or that shame will for long prevent us from adequate portrayal of some of the most serious and beautiful sides of human nature.

10

Following Hand's statement, most modern criticism of obscenity law focused on the large number of literary obscenity prosecutions. *See, e.g.*, Charles Rembar, *The End of Obscenity: The Trials of Lady Chatterley, Tropic of Cancer and Fanny Hill* (1968); Lewis, *supra* (cases where courts applied obscenity law to literary works included Leo Tolstoy's *The Kreutzer Sonata;* Henry James' *Tom Jones*; Boccaccio's *Decameron;* Rabelais' *Gargantua and Pantagruel;* Ovid's *Art of Love*; Voltaire's *La Pucelle*; Theophile Gautier's *Mademoiselle de Maupin*; Wyndham Lewis' short story "Cantelman's Spring-Mate;" Theodore Dreiser's *An American Tragedy*; D.H. Lawrence's *Lady Chatterley's Lover*; James Joyce's *Ulysses*; and Henry Miller's *Tropic of Cancer*).

The abundance of obscenity cases between 1870 and 1930 appears to stem from the clash between American puritanism and erotic fiction writers. Schauer, *supra*, at 13 (noting the development of indigenous American erotic fiction in the largely puritanical society of the early 1800s). Despite ample criticism, staunch supporters of obscenity statutes greatly influenced the development of a formidable body of American law proscribing obscenity. *Id.* at 12. Some scholars describe the most noted of these supporters, Anthony Comstock, as having affected English literature more than any writer, publisher, or critic. (citing Albert Gerber, *Sex, Pornography and Justice* 90-91 (1965)). For those seeking to maintain the status quo, literature's especially enduring and effective qualities posed more of a threat than any other medium of expression. Alec Craig, *Suppressed Books* at 17 (1966) ("It is writing rather than speech that attracts authoritative attention and social pressures because it is so much more enduring and effective; and books have been subject to control of some sort wherever they have been an important medium of communication.") Consequently, in the first one and a half centuries of the United States' existence, most obscenity prosecutions targeted nonpictorial literary works.

11

### iii. Modern United States Obscenity Law

Prior to the 1940s, courts and litigants assumed the constitutionality of legal restraints on obscene speech. Tribe, *supra*. This assumption became the focal point of almost all significant court decisions affecting obscenity law in this century. *See Chaplinsky*; *Roth v. U.S.*, 354 U.S. 476, 481 (1957); *Jacobellis v. Ohio*, 378 U.S. 184, 187 (1964); *Memoirs v. Massachusetts*, 383 U.S. 413, 419 (1966); *Miller v. California*, 413 U.S. at 23; *New York v. Ferber*, 458 U.S. 747, 754 (1982); *Pope v. Illinois*, 481 U.S. 497 (1987).

Most notably, in 1973, the Supreme Court's holding in *Miller* overhauled the standard for judging obscenity. *Miller*, 413 U.S. at 24-25. In its place, the Court advanced a three-part test that has remained the benchmark of obscenity law in the United States ever since: The basic guidelines for the trier of fact must be: (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable [federal] law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. *Id.*; *United States v. 12 200-Ft. Reels of Super 8 MM. Film*, 413 U.S. 123 (1973) (application of the *Miller* standard to federal obscenity-based statutes).

The inception of the *Miller* standard brought with it an explicit recognition of the ever-evolving, contemporary standards of the "community." The Supreme Court recognized that the "community," whether defined on a local level or on a national level, cannot simply be pigeonholed by the standards of previous generations, or by the desires of small, or even large, segments of any community. Rather, just like the Nation, the community is typified by a vast amalgam of differing thoughts, beliefs, and ideologies. The "community" was not intended as either a simple bow to

12

majoritarian or minority tyranny. Rather, the "community" would, as the Nation's Constitution readily embraces, accord with the vigorous protection of minority, or unpopular expression. *See*, *e.g.*, *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938) (Justice Stone's famous proclamation of the rights of "discrete and insular minorities," and the responsibility of the judiciary to uphold the rights of these minorities); *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (protection of rights of Ku Klux Klan to engage in expression embodied in public march); *National Socialist Party v. City of Skokie*, 434 U.S. 1327 (1977); *Texas v. Johnson*, 491 U.S. 397 (1989) (protection of right to express oneself through the burning of the American flag); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (upholding rights of individuals to not be criminally punished for public display of burning a cross).

Likewise, since *Miller*, the development of community standards pertaining to acceptance and/or tolerance of sexually explicit media has progressed to a point where all literary or written works should be fully protected by the First Amendment, unless defamatory, child pornographic, or violative of the "Clear and Present Danger" test. This redefining of what formats are susceptible to state interdiction, prosecution and punishment commenced prior to the 1973 decision in *Miller*, and ultimately culminated with the globalization of information as embodied in the Internet.

In fact, it is entirely reasonable to attribute a rapid evolution, if not revolution, in community standards to the proliferation of Internet communications – which opened access nationwide, and worldwide, to a vast range of literary, social, political and scientific work previously limited by the constraints of world geography. This is certainly not the first time in our history when such has occurred. The intellectual transition/transformation of French soldiers – including most notably the Marquis de Lafayette – returning from the former British colonies following Cornwallis' surrender

at the Battle of Yorktown, brought bold ideas home. These ideas were only previously expressed in (of all mediums) often unpopular written print. Yet, these ideas brought to fruition the ability of normal French citizens to empower themselves through knowledge, and to overcome the limitations of an absolute monarchy. The world became smaller. Similarly, Apollo 8's orbit of the moon on Christmas Eve, 1968, also made "the world become a little bit smaller." A. Scott Frank, The Wonder Years: "The Phone Call," (Original Air Date: April 12, 1988).

Likewise, it is the inception and popularization of the Internet that has resulted in this still vast world being condensed to the mere tapping of a few buttons on a computer keyboard. On previous occasions of change, there was a measure of both fear and trepidation. However, rather than allowing the fear to overcome and dominate, humankind has learned to accept, and even embrace, the change. In no other nation has this ability to adapt and accept been greater than in the United States, under the fundamental protections embodied by its Constitution.

**b. *Federal Statutory Codification of the Miller Test***

The United States Congress has also responded to *Miller*. Specifically, 18 U.S.C. § 1466A, the basis for charges in the instant Indictment against Mr. Gendron, imposes penalties for knowingly receiving a visual depiction of any kind, including a drawing, cartoon, sculpture, or painting, that depicts a minor engaging in sexually explicit conduct; and is obscene. If this statute is premised upon how the federal government defines "sexually explicit conduct," then the Government will have a difficult burden, indeed, in attempting to apply § 1466A to the charged virtual images. "Sexually explicit conduct" is not specifically defined under § 1466A, but a reference is made to the definition in §2256(2)(A) and 2256(2)(B).  A review of these sections makes it abundantly clear that "sexually explicit conduct" as proscribed under federal law refers exclusively to actual or simulated sexual

14

conduct between **real people**, not fictitious conduct culminating in a virtual image of virtual people. *See, e.g.,* 18 U.S.C. § 2256 (definitions section addressing "sexually explicit conduct" as involving a "person"). Additionally, the term "minor" is specifically defined in 18 U.S.C. §2256(1) as a person under the age of eighteen years. Finally, the term "identifiable minor" is defined under 18 U.S.C. §2256(B)(9)(A)(ii) as a person "who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature". The attempt to distinguish the crime in §1466A by adding a "nonrequired element of the offense" that the minor depicted need not actually exist, is in direct conflict with the very statutes cross referenced to define the crime. Consequently, it appears that federal law does not provide the Government with a suitable constitutional means of prosecuting entirely virtual works where no "persons" or "minors" are used.

### i. Conduct and Speech Must Be Inextricably Linked

Limits on the freedom of expression enshrined in the First Amendment only arise where expression and illegal conduct are inextricably linked. *See Roth,* 354 U.S. at 514 (Black, J., concurring) ("[f]reedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action to be an inseparable part of it"). This rationale inheres most strongly in the context of purely fictional works. Fictional materials neither embody actual anti-social conduct, nor have been conclusively shown to incite such conduct. Consequently, the First Amendment should be read to preclude entirely the suppression of such expression.

Applying the *Miller* test to fictional materials contemplates punishment for the mere thoughts provoked by the fictional images, given the absence of any actual antisocial conduct. Indeed, such application fails to then inflict punishment "for overt acts [] or for antisocial conduct." *Roth,* 354

15

U.S. at 509 (Douglas, J., dissenting). This is true because any declaration of obscenity with respect to fictional work must, by definition, depend on the thoughts provoked by such work, as opposed to the work itself. Prohibited hard-core pornography, that which rises to the obscene, can simply not subsist in fictional works because these works do not record or display conduct proscribed under state and federal obscenity statutes. No actual antisocial conduct by any real human being plays any role in the production.

In *New York v. Ferber, supra*, the Supreme Court implicitly acknowledged the pictorial/non-pictorial dichotomy when it ruled that only pictorial representations of child pornography are prohibited. *Id.* at 759. The Court emphasized that "the distribution of descriptions or other depiction of sexual conduct, not otherwise obscene, which do not involve live performance or photographic or other visual reproduction of live performances, retains First Amendment protection." *Id.* at 764-65. This distinction addresses the fundamental difference between actual children and fictional characters; the latter do not showcase illegal or antisocial conduct, nor employ tangible illegal or antisocial conduct for their expression. This is even more valid in a situation where, as here, the indicted images involve purely fictitious, as opposed to real, representations of sexual conduct. The subject matter of a fictional work is not a basis for proscribing its creation and dissemination.

Despite these important distinctions, the charges in the instant case demonstrate that authors or creators of fictional works that tread into taboo areas are still in danger of criminal prosecution for their mere thoughts or fantasies, when put onto the page or computer. Given the differences in the way fictional stories are processed and the utter lack of any sexual conduct by real human beings, the time has come to excise the pure fictional works from the purview of obscenity laws.

This distinction has continued to be recognized by federal courts, including in an obscenity,

16

as opposed to child pornography, context. For example, in *United States v. Pryba*, 678 F.Supp. 1225, 1227 n.3 (E.D.Va. 1988), the district court recognized the deficiencies imbued in non-pictorial material that make such material unfit for designation as "obscene:"

> Significantly, the exercise of describing these materials confirmed a fact that played some role in the Court's decision on these materials, namely, that language, however rich for some purposes, is simply unequal to the task of conveying to a reader what the visual images convey to the viewer. There is, no doubt, a large difference in communicative impact and effect between the written phrase "homosexual fellatio and anal intercourse" and the vivid depiction of it on video. For example, the latter might well be patently offensive, while the former may not. This difference in sensory impact should be taken into account in making judgments about the relevance and probative value of certain of defendants' proffered evidence.

This same rationale should apply to fictional images of sexual conduct which can not possibly carry the same impact as images of actual children engaged in sexual conduct. Likewise, pursuant to the distinctions raised by the *Pryba* and *Ferber* courts, obscenity laws, such as the one under which Mr. Gendron is indicted, rely on the misplaced premise that through stimulating sexual desire, obscene material will lead to sexual conduct that is illegal or otherwise inconsistent with current moral standards. However, there is no basis for any such assumption, and the Government has consistently been unable to tie alleged obscene material together with conduct. *See, e.g., Free Speech Coalition, supra* (dismissing the Government's notion that the challenge material results in the aggrieved conduct).

### ii. Fictional Works Generated Without the Use of Actual People Should Be Assessed Under the Clear and Present Danger Standard

The United States Supreme Court has indicated repeatedly that States can normally restrict expression if it tends to prompt disobedience or destruction of life or property. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 595 (1980) ("when the government

attempts to regulate speech of those expressing views on public issues, the speech is protected by the First Amendment unless it presents 'a Clear and Present Danger' of a substantive evil that the government has a right to prohibit." (Rehnquist, J., dissenting) (citation omitted); *Cohen v. California*, 403 U.S. 15, 18 (1971) (punishing a defendant for wearing jacket with statement "Fuck the Draft" violates the First and Fourteenth Amendments unless defendant intended to incite civil disobedience); *Bridges v. California*, 314 U.S. 252, 261 (1941) (prosecutors must show newspaper articles "created such likelihood of bringing about the substantive evil as to deprive them of the constitutional protection") (quoting *Gitlow,* 268 U.S. at 671).

The Court has used the "Clear and Present Danger" test to balance First Amendment freedoms and government interests in preventing violence and destruction. The modern interpretation of the test denies constitutional protection to speech "directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. at 447. Nonetheless, it has also been held that "the government may regulate obscenity even though its [sic] does not present a clear and present danger." *Central Hudson Gas*, 447 U.S. at 596 (Rehnquist, J., dissenting). The exceptional treatment of obscenity flows from the fuzzy premise that obscenity lacks "redeeming social importance," and therefore "is not within the area of constitutionally protected speech or press." *Roth*, 354 U.S. at 484, 485; *see Miller*, 413 U.S. at 23; *Chaplinsky,* 315 U.S. at 571-72. Thus far, the courts have inexplicably failed to require the government to establish the existence of a compelling governmental interest in restricting speech, when evaluating the constitutionality of content based restrictions on speech premised on the concept of 'obscenity' as it would be required to do with any similar law. *See ACLU v. Reno, supra; ACLU v. Ashcroft, supra*. The existing justification for such restriction lacks any principled constitutional

18

basis because obscene expression in a pure, fictional work is expression just the same, notwithstanding its potentially provocative content and, as such, deserves the same consideration afforded other expression.

Judicial exclusion of obscenity from the realm of presumed constitutionality reflects an unfounded assumption that obscenity *per se* harms society. Yet, the harm which obscenity supposedly causes is far from apparent and has never been judicially established. No scientific evidence has been accepted by any court – tending to establish a link between obscene materials and any sort of recognized harm flowing from their distribution or consumption. The courts have been satisfied to presume that obscene speech is outside the purview of protected expression, as a matter of law, without the most basic of proof or correlation to harm. Whatever harm could fairly be attributed to obscene materials, it is drastically reduced when the content at issue involves pure fiction without any actual depictions of human sexual activity.

Given the lack of any presumptive harm resulting from textual expression, the "Clear and Present Danger" test should be the sole arbitrator of whether written materials lose their presumptive First Amendment protection. Such standard is sufficient to address any concerns that obscene expression endangers American society's moral fabric. *See Commonwealth v. Gordon*, 66 Pa. D. & C. 101 (1949), *aff'd sum nom. Commonwealth v. Feigenbaum*, 70 A.2d 389 (Pa. Super. Ct. 1950). In *Feigenbaum*, the Pennsylvania Supreme Court specifically approved the "Clear and Present Danger" test as "applied to alleged obscene literature." *Id.* Under *Feigenbaum*, the state was required to demonstrate a danger and the clarity and imminence of the danger to defeat constitutional protection.  Absent adoption of a "Clear and Present Danger" standard, the "legality of publication [will] turn on the purity of thought [a work] . . . instills" and courts will inflict punishment "for

19

thoughts provoked, not for overt acts nor antisocial conduct." *Roth,* 354 U.S. at 508, 510 (Douglas, J., dissenting). The "Clear and Present Danger" test conforms to traditional First Amendment doctrine and supplies an appropriate measure for allegedly obscene fictional works.

In the instant case, the prosecution does not rest upon works that actively advocate for the immediate, violent overthrow of the Government; nor do the charged stories campaign for the assassination of public figures (18 U.S.C. § 1751); nor does the drafting and publication of these stories coincide with the destruction of public property (*United States v. O'Brien*, 391 U.S. 367 (1968)); nor do they involve the passing on of national secrets (*United States v. Gravel*, 408 U.S. 606 (1972)). Rather, the stories involve fictitious, detached scenarios with fabricated individuals. No one was harmed in the making of these images. The Government is unable to prove the existence of any harm except to idly speculate on the potential thoughts that these stories could incite in the mind of an individual. Such supposition is insufficient to deprive materials of their constitutional protection and to force Mr. Gendron to endure a criminal trial as a result.

**D.    Conclusion**

In *West Virginia State Bd. of Education v. Barnette*, 319 U.S. 624, 641 (1943), involving efforts on the part of the State to impose a flag salute requirement upon public school students, Justice Robert Jackson referred to the central meaning of the First Amendment as providing the "freedom to be intellectually and spiritually diverse." Justice Jackson further wrote that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* at 642.

Justice Jackson's understanding of the First Amendment evokes a rule that mandates

20

tolerance of offensive speech, i.e., speech that conveys offensive messages. Although this same liberal degree of tolerance need not be extended to offensive conduct, Kurt Vonnegut, *Slaughterhouse-Five or The Children's Crusade: A Duty Dance With Death*, (Delacorte Press, 1969), *passim*. it is nevertheless essential that any analysis of even difficult and close case arising in this context give full effect to the multi-dimensional aspects of the idea of freedom. "The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty – and thus a good unto itself – but also is essential to the common quest for truth and vitality of society as a whole." *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 503- 04 (1984).

Justice Louis Brandeis perhaps expressed this essential constitutional ideal with the greatest eloquence in his concurrence in *Whitney v. California*, 274 U.S. 357, 372 (1927) (Brandeis, J., concurring):

> Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law--the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed. Fear of serious injury cannot alone justify suppression of free speech and assembly.

21

Men feared witches and burnt women. It is the function of speech to free men from
the bondage of irrational fears. *Id.* at 375-76 (citation omitted).

Indeed, when placed into the context of the pending prosecution against Mr. Gendron, we
are confronted with exactly the hazards of which Justice Brandeis warned. The current prosecution
is aimed at discouraging the thought, expression and imagination of Mr. Gendron and other willing
recipients of fictional images.  This prosecution is premised upon a fear for unusual and, at times,
fantastic ideas being expressed in the images acquired by Mr. Gendron. The continuation of this
prosecution not only constitutes repression of the thoughts and ideas that must circulate freely in a
free society, but also endangers the stability of our constitutional system. Tolerance of what is
perhaps noxious speech is a principle embodied within the very fabric of the First Amendment. After
all, "even the slightest redeeming social importance – unorthodox ideas, controversial ideas, even
ideas hateful to the prevailing climate of opinion" must be afforded of the protection of the First
Amendment's guarantees. *Roth*, 354 U.S. at 484-85.

Accordingly, the charges lodged against Mr. Gendron must be dismissed.

Respectfully submitted,


/s/Diane L. Dragan
DIANE L. DRAGAN
Assistant Federal Public Defender
1010 Market Street, Suite 200
St. Louis, Missouri 63101
Telephone: (314) 241-1255
Fax: (314) 421-3177
E-mail: Diane_Dragan@fd.org

ATTORNEY FOR DEFENDANT

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2009, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Reginald Harris, Assistant United States Attorney.


/s/Diane L. Dragan
DIANE L. DRAGAN
Assistant Federal Public Defender